IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






No. AP-74,336





WILLIAM BERKLEY, Appellant



v.



THE STATE OF TEXAS






ON DIRECT APPEAL


FROM EL PASO COUNTY





 

 Johnson, J., delivered the opinion of the Court, joined by Keller, P.J., Price,
Womack, Keasler, Hervey, Holcomb, and Cochran, JJ. Meyers, J., not participating.



O P I N I O N



 Appellant was charged with capital murder by an indictment that alleged, in three paragraphs,
murder in the course of committing and attempting to commit robbery, kidnapping, and aggravated
sexual assault. (1) A jury convicted appellant, and pursuant to the jury's answers to the special issues,
the trial court sentenced appellant to death. On appeal, appellant raises twelve points of error.


I. JURY SELECTION


 Point of error one alleges that the trial court erred in overruling appellant's objection to the
prosecution's use of commitment questions during jury selection. The record shows that individual
voir dire was conducted over several weeks. After challenges for cause were exercised and some
prospective jurors were excused by agreement, over forty prospective jurors remained. The parties
then exercised their peremptory challenges, with appellant exhausting all of his. Twelve jurors and
two alternates were selected.

 Appellant complains about hypothetical scenarios which the state posed to thirty-eight
prospective jurors (although he lists only thirty-seven by name), and lists twenty-eight who were still
prospective jurors when peremptory challenges were exercised. Eight of those twenty-eight, six
regular jurors and both alternates, served on the jury. By way of example, appellant recites the 
questioning of prospective jurors Galindo and Rosas, during which the prosecutor used 
hypotheticals involving death as a result of mercy killing, domestic violence, and bullying. 
Appellant claimed both at trial and on appeal that such hypotheticals improperly commit and contract
with prospective jurors in violation of Standefer v. State, 59 S.W.3d 177 (Tex. Crim. App. 2001).

 "An attorney cannot attempt to bind or commit a prospective juror to a verdict based on a
hypothetical set of facts." Standefer, supra at 179, quoting Allridge v. State, 850 S.W.2d 471, 480
(Tex. Crim. App. 1991), cert. denied, 510 U.S. 831 (1993). "Commitment questions 'commit a
prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a
particular fact.'" Lydia v. State, 109 S.W.3d 495, 498 (Tex. Crim. App. 2003), quoting Standefer,
supra. While a commitment question can be proper or improper, in Standefer we announced the
inquiry for improper commitment questions to prospective jurors:

 (1) Is the question a commitment question, and (2) Does the question include facts -
and only those facts - that lead to a valid challenge for cause? If the answer to (1) is
"yes" and the answer to (2) is "no," then the question is an improper commitment
question, and the trial court should not allow the question.


Standefer, supra at 182-83. "Commitment questions are improper when (1) the law does not require
a commitment or (2) when the question adds facts beyond those necessary to establish a challenge
for cause." Lydia v. State, 109 S.W.3d at 498.

 Appellant acknowledges that the prosecutor "scrupulously avoided actually asking any
prospective juror whether he would actually assess a five-year probation under these hypothetical
circumstances, but did follow up in each instance with the broad question whether the prospective
juror could conceive a scenario in which he or she could consider such a punishment." Appellant
asserts that, by prefacing her otherwise broad question with fact-specific hypotheticals, the
prosecutor was, "in essence, asking the prospective jurors how they would resolve that broader
question in light of the specific facts posed"; that is, the prosecutor was asking prospective jurors
"whether they could consider probation for a 'mercy killing' or when the victim was of an
unpalatable character." (2)

 It appears to us that, in using those hypotheticals, the prosecutor was not asking prospective
jurors to resolve, or to refrain from resolving, any issue in any certain way after learning of a
particular fact, and thus was not asking a commitment question, prohibited or otherwise. Rather, the
prosecutor was presenting possible scenarios to facilitate inquiry into the prospective juror's views
regarding punishment. Because the challenged inquiries were not improper commitment questions,
we conclude that the trial court did not err in overruling appellant's objections thereto. We overrule
point of error one.

 Point of error two alleges that the trial court erred in denying appellant's challenge for cause
against prospective juror Davis because she was not able to objectively assess the credibility of
police witnesses. Appellant asserts that prospective juror Davis held an extreme or absolute position
regarding the credibility of a witness and, because of her categorical belief in the infallibility of a
police officer's testimony, she had a bias that rendered her challengeable for cause.

 The record reflects the following exchange between the attorneys and prospective juror
Davis:

Q [STATE]: Police officers, FBI agents, Department of Public Safety forensic people, with

 regard to law enforcement witnesses.


 To be qualified as a juror, a juror has to be able to listen to those types of witnesses with an

 open mind. Would you be able to do that?


A [DAVIS]: Yes.


Q: You're not going to automatically believe or disbelieve a person in law enforcement just

 because they're in that field?


A: I would be more inclined to believe them, but if it seems unbelievable, I wouldn't. But if I

 didn't know, I would be inclined to accept what they said.


Q: But you're not going to automatically believe them over any other type of witness; is that

 correct?


A: You mean over like a citizen as opposed to a policeman?


Q: Well, when you say that you're inclined to, but if you listen to them and you don't find it

 believable, you could go with that?


A: That's right.


Q: The issue is, are you going to attach believability to them before you listen to them?


A: No. But if a policeman said she had a green dress on and a regular person said she had a blue

 dress on, I would be more inclined because I think they're trained in observation methods.

 But that's the only example I can think of.


Q: So you can consider their opinions where they have given you, maybe, their qualifications

 behind that?


A: Yes.


Q: But you don't think that, as a general rule, they're not capable of lying?


A: That's correct, I don't think that.


Q: They're human just like everybody else?


A: (Indicating.)


Q: So you can wait and listen to them, and then make up your mind after you hear them testify?


A: Yes.


 When questioned by appellant, prospective juror Davis revealed the following:

Q [DEFENSE COUNSEL]: You indicated you're more inclined to believe police officers; is that

 correct?


A: That's correct.


Q: And as I think [one of the prosecutors] said, that does cause me a little concern.


A: I understand.


Q: Right.


A: That's just the way I was raised.


Q: Sure. Sure. For example, if the cop said the light was red, and the citizen said the light was

 green, and that's it, that's all you're going to hear --


A: If I was involved in it, it would make a difference, if the citizen was seeing it as I saw it or

 as the policeman saw it.


Q: Right.


A: But if I wasn't involved in it, yeah, I would believe the policeman.


Q: So pretty much you'd go with a guilty, right?


A: In that instance that you quoted me.


Q: Okay. Now, my question to you is: Because of that leaning --


A: Yes.


Q: - - what I'll call a predisposition, can you put that aside or not?


A: I think I can make a judgment as to if I believe a person or not. That's all I can do. And if -

 - if, in the instance you gave, if all it was was one single fact, I would be more inclined to

 believe the policeman. But if there is something where an interpretation was involved, I

 would use my judgment.


Q: Okay. Let's just - - let's just go with the simple hypothetical.


A: Okay.


Q: With that hypothetical in mind, would you pretty much, under that circumstance, without

 more, go with the cop?


A: Yes.


Q: Then I've got to go back to the question I asked you before: Can you put that opinion aside

 and not be predisposed?


A: I'm not sure.


Q: Okay.


A: If I have two people telling me something and one of them's a policeman, I'm going to be

 inclined to believe the policeman unless I have some reason not to.


Q: Okay. At this point, you're not sure whether you could put aside that opinion or that belief?


A: That's right.


Q: Okay. And I'm going to kind of make a quantum leap here in logic and go on to your view

 on the death penalty[.]


 * * *


A: I don't have a leaning towards [the death penalty in a capital murder case] like that with

 the policeman. I believe I can make the distinction that, as you know, you all talked about.


Q: Okay.


A: But I feel more of a leaning towards the policeman than this other thing. I think I can

 separate the two --


Q: Right.


A: - - on this -


Q: The death penalty deal?


A: Yes, I do.


Q: Two different scenarios in your viewpoint, right?


A: Yes.


Q: Let me give you an example. Let's say the cop says he took the confession voluntarily, but

 a defendant says that the cop threatened to beat him up and arrest his girlfriend if he didn't

 sign the dotted line.


A: Okay. That's a better example that I think I can separate there than just a factual thing. I do

 believe the observation powers of a policeman are pretty good, but in a case like that, I would

 - - I think I could make a judgment in that type of case as to whether I believe the person or

 not.


Q: Okay. All right.


A: And I wouldn't necessarily lean toward the policeman. I wouldn't be predisposed --


Q: On the confession scenario?


A: - - on that one that you gave.


Q: Okay. So under that hypothetical, where we have two different facts on the record, two

 different factual scenarios, two different forms of testimony --


A: Yeah.


Q: - - where the defendant's saying he was coerced to give a confession --


A: Yeah.


Q: - - and we have the detective saying no coercion was involved, do you think you could judge

 the credibility of each one of them, right?


A: Yes, I do in that scenario.


Q: And you wouldn't automatically believe the cop?


A: No, not that one.


Q: I have to ask you, how come you believe police officers have better powers of observation

 than, let's say, your average member of the community here?


A: Because of the training that - - I don't know what they've been through, but you see things

 on TV where - - I'll use the word model because I can't think of the word - - silhouette pops

 up and then it goes down, and I believe they go through training where they have to identify

 that as a bad person, good person, a person they could shoot. And in their mind, they're

 thinking of details of that person, and, to me, I'm just thinking of getting out of there or

 protecting myself.


 * * *


Q: Okay. Can you put that belief, that you think that police officers have greater powers of

 observation than somebody else, can you put that aside or not?


A: No, I don't think I can. I think, generally speaking, they do have better powers of

 observation.


 The record reflects that prospective juror Davis was insistent in her belief that police officers
have better powers of observation than other people and that she would therefore be more inclined
to believe a police officer in a situation which involved his powers of observation. However, she
also clearly indicated that she would not necessarily be so inclined to believe a police officer in other
situations.

 It is well settled that, if prospective jurors have a predisposition to believe police officers
such that it would prevent those persons from impartially judging the credibility of such witnesses,
they have demonstrated a bias against the defendant and are subject to a challenge for cause pursuant
to Article 35.16(a) of the Code of Criminal Procedure. Hernandez v. State, 563 S.W.2d 947, 950
(Tex. Crim. App. 1978). However, in Gardner v. State, 730 S.W.2d 675, 692-93 (Tex. Crim. App.),
cert. denied, 484 U.S. 905 (1987), we approved the denial of a challenge for cause against a
prospective juror who had repeatedly indicated that he would lean toward the testimony of a police
officer as opposed to a lay witness because of his deference to what he assumed to be the officer's
superior powers of observation. We pointed out that such deference was "not at all an invalid
consideration in weighing the reliability of any witness, provided the record bears out the
assumption." Id. The record reflects that prospective juror Davis was clearly distinguishing between
leaning toward believing a police officer's observations based upon her belief in the officer's training
and not being predisposed to believe a police officer's testimony when it did not involve his powers
of observation. In Feldman v. State, 71 S.W.3d 738, 747 (Tex. Crim. App. 2002), we reviewed the
trial court's denial of a challenge for cause to a prospective juror who stated that he would lean
towards believing an officer over a lay person. We commented that the prospective juror was not
subject to a challenge for cause solely on the basis that he was more or less skeptical of a certain
category of witness.

 In the instant case, we likewise conclude that the trial court did not err in denying appellant's
challenge for cause against prospective juror Davis for not being able to objectively assess the
credibility of police witnesses. We overrule point of error two.

 Point of error three asserts that the trial court erred by denying appellant's challenge for cause
against prospective juror Lucero because he was predisposed to assess the death penalty for anyone
convicted of capital murder. Appellant argues that every time Lucero was questioned specifically
in terms of how a guilty verdict would affect his answer to the first special issue, "[H]e stated
without contradiction that he would 'automatically' find 'future dangerousness' should he find
[a]ppellant guilty" and thus, the trial court abused its discretion in denying his challenge for cause.

 The record reflects that Lucero answered questions from both defense counsel and the state
with regard to whether he would be predisposed to answer the future-dangerousness special issue
"yes" after a finding of guilt of capital murder.

Q: [STATE]: Now, special issue number one, would you be able to answer that question based on

 the facts and circumstances of a given case?


A: [LUCERO]: Yes.


Q: And you would not automatically answer it to ensure that a particular result occurred?


A: Right.


Q: Now, let's move on to special issue number two.


 * * *


Q: So with regard to special issues number one and two, I need to ask you, also, because we
have the burden of proof, we have to prove those beyond a reasonable doubt, which means
that you can't answer them automatically just on a finding of guilt. Okay? Do you
understand that?


A: Yes, ma'am.


Q: You have to wait and hear the evidence and then answer those questions.


A: Okay.


 * * *


Q: Same question again: Just because you're in favor of the death penalty doesn't mean you're

 going to answer these automatically to impose guilt [sic] just on a finding of guilt?


A: Yes, ma'am.


Q: You will or you won't?


A: No, I won't.


Q: You will listen to the evidence - -


A: Yes, ma'am.


Q: - - hold us to our standard of proof, and then make your decision?


A: Yes, ma'am.


 * * *


 Appellant's attorney then questioned Lucero.


Q: And because it is so strong, aren't you automatically - - if you believed someone was guilty

 of capital murder, aren't you going to sentence them to death based on your belief?


A: If the facts are there, yes.


Q: Well, if the facts are there - - you've already found the individual guilty of capital murder.

 Those facts are there.


A: Right.


Q: Those facts are there. Now, with those facts, are you going to sentence them to death?


A: Yes, sir.


Q: You see, these issues up here [indicating], they pretty much give the juror latitude to go one

 way or the other. But what I'm hearing is, if you believe someone committed capital murder,

 you are going to give them the death penalty, right?


A: If the facts are there, yes.


Q: The facts that they committed capital murder?


A: Yes.


Q: If those facts are there, you will give them the death penalty, right?


A: I don't know.


 Defense counsel passed Lucero back to the state, and the prosecutor continued the inquiry.

Q: Are you implying - - are you talking about the facts that lend themselves to imposing the

 death penalty, or are you just talking about on finding a person guilty of capital murder? 

 Because he would ask you that, and then you would say "if the facts are there." You

 understand that you have to have found someone guilty to get to these issues [indicating]?


A: Right.


Q: Then there would be additional evidence.


A: Right.


Q: Is that the facts you're referring to?


A: Yes.


Q: Because you can't - - and that's why I asked you. When I asked you if you would

 automatically do it, you indicated you would not, that you would listen to the evidence - -


A: I would listen to the evidence.


Q: - - and - - and then decide whether or not it's life in prison or the death penalty.


A: Right. Yes.


Q: Can you do that fairly?


A: Yes.


Q: And you can keep an open mind until you hear the facts?


A: Yes.


Q: Okay. And after listening to the evidence in this case, if all the facts indicated that it should

 be life in prison, could you do that?


A: No.


Q: Even if the facts demonstrated that?


A: Say it one more time. I'm confused.


Q: I'm confusing you. I'm sorry. If the facts indicated that the sentence should be life in prison

 - - in other words, if there were mitigating circumstances that said that, could you do that?


A: Yes.


Q: And if the facts warranted that the death penalty should be imposed, could you do that?


A: Yes.


Q: So you can consider both, until you hear the facts?


A: Yes.


 The state passed Lucero, and defense counsel questioned him further.


Q: Sir, if you found someone guilty of capital murder, could you give them a life sentence?


A: Yes.


Q: You could?


A: [Indicating.]


Q: Because to me, you're changing your opinion a little.


A: Well, it'll go - - well, depending how the case goes, really.


Q: All right. This is the premise: You've found someone guilty of capital murder.


A: Right.


Q: You've told me you believe in an eye for an eye.


A: Right.


Q: Does that mean if you find someone guilty of capital murder, you're giving them the death

 penalty?


A: [No response.]


Q: To me, it seems you're inclined to give the death penalty. That's what I'm hearing. I might
be wrong.


A: Well, I do believe in it.


Q: Right. Does that mean, since you believe in it, if you've found someone guilty of capital

 murder, you're giving them the death penalty? Is that what that means?


A: Listening to - - on that, I would say no, then.


Q: You would say - - why would you say no?


A: Depending how everything went.


Q: Okay. Because this is what we're trying to do: We're trying to get jurors who can keep an

 open mind.


A: Right.


Q: Some jurors cannot keep an open mind, and I'll give you some reasons why I'm not sure you

 can. If you can, great, but if you can't, you should not be a juror in this case, because the law

 says that only people who can truly, truly keep an open mind should be on the jury.


 For example, if someone is predisposed to not consider the death penalty because they

 disagree with it, and they say, Nah, I ain't giving anybody the death penalty, they're gone.

 Okay.


 If someone says, an eye for an eye, you kill, you [sic] gonna get killed, okay, that person can't

 keep an open mind either, and they should be let go also under our law.


 So my honest question to you is: Can you really keep an open mind as to life versus death

 if you found someone guilty of capital murder? Can you do that?


A: Yes, I can.


Q: All right. Let me give you some reasons why I'm not sure - - I think you can't. Of course,

 what I think doesn't matter. It's what the judge thinks. Okay?


 * * *


Q: Am I right or wrong? Can you keep an open mind in this case, sir?


A: Yes, I can.


Q: If I [sic] find someone guilty of capital murder, are you going to automatically give them the

 death penalty?


A: Yes.


Q: All right.


 Defense counsel again passed Lucero, and the state again questioned him. It pointed out that
they were receiving different answers from him, and explained that the issue was whether he could
keep an open mind, i.e. not make a determination until he hears the facts. The prosecutor then
explained about the bifurcated trial process and that the state had to prove, beyond a reasonable
doubt, the answers to the punishment special issues, and that Lucero could not automatically do
anything without hearing the second part of the trial.

 Q: [State] Can you set aside your personal feelings, and answer those questions based on the
facts and circumstances or on the evidence in this case?


A: [Lucero] Yes.


Q: And you can openly consider life, as well as the death penalty, and you're not going to

 automatically impose the death penalty?


A: I see what you mean.


Q: Are you automatically going to impose the death penalty simply based on the fact the

 person's found guilty?


A: Yes.


Q: You will?


A: Yes, I will.


Q: Under all circumstances?


A: [Indicating.]


Q: I'm sorry, you have to answer out loud.


A: Yes.


Q: So you could not consider life in prison?


A: No.


Q: Never.


A: Yes.


Q: Okay. Why don't you reiterate it back to me.


 The trial court overruled appellant's "been asked and answered" objection. The prosecutor
continued:

Q: Okay? Because I'm not sure I haven't confused you at this point.


A: If the person - - if the person is found guilty with the facts and everything, yes, I do believe

 in the death penalty.


Q: Okay. And are you going to impose that regardless of what the facts and circumstances

 show?


A: Oh, regardless?


 After the trial court overruled another objection from appellant, the prosecutor again
explained the two parts of a jury trial and the operation of the special issues at punishment, and
continued to question Lucero.

Q: So what the law requires is that a person be able to answer those questions based on the facts

 and circumstances, not just on the finding of guilt, because, you know, in the second part,

 we're going to have to prove one and two to you beyond a reasonable doubt.


A: Right.


Q: So there would be other facts and circumstances in that second part of trial, additional evidence.


 When you get to special issue number three, the law says that if the facts and circumstances

 warrant life in prison, the juror has to be able to do that and consider that fairly and honestly

 and equally as if the facts and circumstances warrant the death penalty.


 Now, my question is, can you consider life in prison if the facts and circumstances justify it --


A: Yes.


Q: - - or show it?


A: Yes.


Q: And could you consider the death penalty if that's what the facts and circumstances show?


A: Yes.


 The state again passed Lucero, and defense counsel questioned him. 

Q: [Defense counsel] Sir, in relation to question number one - -


A: [Lucero] Right.


Q: - - if you've found someone guilty of capital murder, you're going to believe that they're a

 future danger to society, right?


A: Right.


Q: Just based on the fact that they were convicted of capital murder, right?


A: Right.


 After the trial court denied appellant's motion for a hearing outside Lucero's presence,
defense counsel questioned Lucero about his belief that the death penalty is underused because there
are too many murderers living in prison right now and that the state ought to just kill them because
they're wasting taxpayer dollars and that, by killing someone, they forfeited their right to live in
society. However, Lucero then indicated that he would not give someone the death penalty based
upon the fact alone that they had been found guilty of capital murder and that he did not believe that
they had forfeited their right to live. Defense counsel pointed out that Lucero was giving conflicting
answers.

Q: But what I'm trying to find out, sir, is if you're predisposed to give the death penalty, and it

 appears to me that you are. Am I right?


A: No.


Q: Okay. But you believe the death penalty is underused.


A: Yes.


Q: Because we should not house people in the pen that commit murder; we should execute

 them, right?


A: Yes.


Q: Okay. So you are predisposed to believe that we should execute everyone who commits

 murder, correct?


A: Yeah.


Q: And for that reason, you cannot legitimately consider a life sentence for capital murder, can

 you?


A: Well, it all depends.


Q: Everything depends on everything. But my question is: Based on your views and yourconvictions against murderers and your belief that we shouldn't house them in the pen, we
ought to kill them, you can't honestly consider a life sentence in this case, can you?


A: No.


 Defense counsel passed Lucero, and the state continued its efforts to make sure that Lucero
understood that he couldn't automatically impose one sentence or the other based upon a guilty
verdict alone, (3) and that the law says that he could not automatically answer special issue number one
"yes" just because a person has been found guilty of capital murder; the state had to prove to the jury,
beyond a reasonable doubt, that the person will a danger in the future. The state again explained to
Lucero the bifurcated nature of the trial and that only after a guilty verdict would they enter the
second phase in which the state would make opening arguments, present evidence, and have the
burden of proof. Only then would the jury consider the special issues. The state then reiterated that
"[t]he law says you have to keep your mind open in that second part of trial, ..., to the full range of
punishment, that being life in prison or the death penalty, if and until you've heard all the evidence
in a case." Lucero indicated that he understood. 

Q: That's where the automatic, not automatic part comes in. Okay?

 

 Can you honestly and openly consider the full range of punishment in a capital murder, that

 being life in prison, as well as the death penalty depending on the facts and circumstances?


A: Yes, ma'am.


Q: And if the facts and circumstances demonstrate it or warrant it, that the person deserves or

 gets life in prison, can you do that?


A: Yes, I can.


Q: Or the opposite?


A: The opposite, yeah.


 The state then passed Lucero, who was permitted to step out of the courtroom. Appellant
challenged him for cause, stating that Lucero had disqualified himself a number of times and had
answered the state's questions "about three times" against its position. In particular, he pointed out
that, when appellant had asked Lucero whether he could legitimately consider a life sentence if he
found someone guilty of capital murder based on his views, his answer was, "No, I cannot." 
Appellant added that, based upon Lucero's "demeanor and his vacillation," it had not been shown
that he could "keep an open mind on the full range of punishment in a capital murder case." Without
waiting for a response from the state, the trial court, believing that Lucero "equivocated because of
his confusion," found that he was a qualified juror and overruled appellant's objection.

 A vacillating prospective juror gives contradictory responses to voir dire questions which test
his ability to follow legal requirements. Howard v. State, 941 S.W.2d 102, 107 (Tex. Crim. App.
1996). Clearly, the voir dire demonstrated that Lucero was very much a vacillating prospective juror,
at times indicating that he would automatically impose the death penalty based simply upon a finding
of guilt of capital murder, at other times indicating that he would not.

 When confronted with such a prospective juror who vacillates on his ability to answer the
special issues without conscious bias or distortion, we defer to the findings of the trial court. (4)
 Green
v. State, 840 S.W.2d 394, 405 (Tex. Crim. App. 1992), cert. denied, 507 U.S. 1020 (1993). Lucero
was clearly such a vacillating prospective juror. Accordingly, we defer to the trial court's action in
denying appellant's challenge for cause. We overrule point of error three.

II. EVIDENTIARY RULINGS


 Point of error four asserts that the trial court erred by overruling appellant's objection to
evidence about his DNA profile. Point of error five alleges that the trial court erred by denying
appellant's motion to strike expert testimony that his DNA profile matched that of spermatozoa
recovered from the complainant's body.

 Appellant complains about expert testimony from an FBI forensic DNA examiner who
sponsored a dried bloodstain from a known blood sample from appellant. When that exhibit was
offered into evidence, appellant stated, "No objection," and the evidence was admitted. This witness
also sponsored a DNA profile from that known sample, and when it was offered into evidence,
appellant again stated, "No objection," and the profile was likewise admitted into evidence. On re-direct and re-cross examination, the FBI expert testified that, while the dried bloodstain was prepared
in his laboratory by a technician, he himself did not see it done. He also admitted that he did not
make the card sample that he had used to create the profile. Appellant then successfully objected
to any further testimony from him, but the trial court denied appellant's request to exclude the
evidence that had already been admitted and also denied appellant's request for a mistrial.

 A Texas DPS crime-laboratory criminalist analyzed a known blood sample of the
complainant and unknown semen/spermatozoa taken from the complainant's body and generated
DNA profiles of each. This DPS expert then testified, over appellant's objection, that the sperm
taken from the complainant's body matched the blood sample known to have been taken from
appellant. Appellant unsuccessfully objected to her testimony and an exhibit comparing her sperm
analysis to the FBI's analysis of appellant's known blood sample because the prior testimony about
the FBI's sample was not from personal knowledge and was based upon pure hearsay. After the DPS
expert completed her testimony, appellant again unsuccessfully sought to strike the FBI's DNA-profile exhibit.

 Later that day, the state re-called the FBI expert, who explained the team concept of work
in his laboratory, i.e. that he had technicians that worked with him in conducting examinations under
his supervision. He stated that he supervises all the members on the team and reviews their work
and that he receives the data that his technicians prepare, interprets all the work they have done,
makes conclusions, and prepares the report based upon those conclusions. He emphasized that the
DNA profile generated for appellant was his work and that the results were prepared by him. On
cross-examination, he admitted that he was not present when one of his technicians prepared the
dried sample from liquid blood, nor when the actual testing procedure was done.

 Appellant stated, "No objection," to the FBI DNA-profile exhibit. Thus, it was properly
admitted into evidence and could properly be referred to in subsequent testimony. The FBI and DPS
experts' testimony about present opinions of test results was based on personal experience and was
not objectionable hearsay. Martinez v. State, 22 S.W.3d 504, 507-08 (Tex. Crim. App. 2000);
Aguilar v. State, 887 S.W.2d 27 (Tex. Crim. App. 1994)(plurality opinion). Tex. R. Evid. 705(a)
provides that an expert may disclose the underlying facts or data of which the expert opinion is based
upon. The DPS expert's testimony was based upon the facts and data which were manifested in the
exhibit comparing her analysis to the FBI expert's analysis. Thus, it was permitted, and the trial
court did not err in overruling appellant's objection to the DPS expert's exhibit. We conclude that
the trial court properly overruled appellant's objections to the DNA testimony and evidence. We
overrule points of error four and five.

 Points of error six and seven assert that the trial court erred at the guilt phase by overruling
appellant's objection to photographs of the complainant's body. Appellant argued that the
photographs were inadmissible because their probative value was substantially outweighed by their
potential for unfair prejudice (point of error six) and they were cumulative of other evidence
establishing the same facts (point of error seven).

 The photographs of the complainant were taken either at the place where her body was
discovered or at the office of the medical examiner. Appellant objected to, and urged the trial court
to exclude, exhibits 37 through 41, which were photographs of the complainant taken where her
body was discovered, because the prejudice far outweighed the probative value and because they
were cumulative of exhibit 36, which also depicted the complainant's body where it was discovered. 
Appellant also asserted that exhibits 40 and 41 were cumulative of each other. The trial court
overruled appellant's objections and admitted exhibits 37 through 41 into evidence.

 Shortly thereafter, appellant objected to the state's proffer of exhibits 43 through 50, which
were photographs of the complainant's body taken during an autopsy performed at the medical
examiner's office. Appellant argued that the photos were cumulative and that their probative value
was outweighed by substantial prejudice. He argued further that the gruesome nature of these photos
would deprive him of a fair trial and that his right to "due process and due course" would be violated
if the photos were admitted into evidence. The trial court also overruled these objections and
admitted the challenged photographs into evidence.

 Appellant contends that because "the manner of [the complainant's] death was not contested,
nor was the cause of her death ambiguous or uncertain," the photographs had very little probative
value and have nothing to do with the state's burden of proof. Appellant also questions whether the
photographs were relevant to material issues and whether those issues could have been established
just as well without the photos. He also urges that "the appearance of physical injury and the extent
to which it has produced appalling harm to the body of a deceased person is never an element of the
offense of murder or capital murder."

 A relevant photograph has "any tendency to make the existence of any fact that is of
consequence to the determination of the action more probable or less probable than it would be
without the evidence[, and t]he admission of photographs into evidence is within the discretion of
the trial court and will not be disturbed absent an abuse of that discretion." Wyatt v. State, 23 S.W.3d
18, 29 (Tex. Crim. App. 2000). See also, Tex. R. Evid. 401. Appellant acknowledges that the
photos were "obviously relevant," although he questions their "real probative value."

 When determining whether the trial court erred in admitting photographs into evidence, we
determine whether the probative value of the photographs is substantially outweighed by the danger
of unfair prejudice, and whether admission would confuse the issues, mislead the jury, or needlessly
cumulate evidence. Wyatt, supra. See also, Tex. R. Evid. 403. "If there are elements of a photograph
that are genuinely helpful to the jury in making its decision, the photograph is inadmissible only if
the emotional and prejudicial aspects substantially outweigh the helpful aspects." Erazo v. State, 144
S.W.3d 487, 491-92 (Tex. Crim. App. 2004).

 Exhibits 36 through 41 are views of the crime scene at decreasing distance and various
positions with respect to the complainant's body. Exhibits 36-39 show the complainant's body. 
Exhibit 40 shows the complainant's body from the waist up, and exhibit 41 shows the complainant's
head and the wounds to her face. These exhibits are not particularly gruesome. Nor do we find that
any of these five exhibits were cumulative, as each one showed the complainant from a different
view and distance.

 "Autopsy photographs are generally admissible unless they depict mutilation caused by the
autopsy itself." Rayford v. State, 125 S.W.3d 521, 529 (Tex. Crim. App. 2003), cert. denied, 125
S.Ct. 39 (2004). Exhibits 43 through 47 show the complainant on a stainless-steel autopsy table and
depict front, top, and side views of the complainant's head and face wounds, with blood cleaned
away and some areas of her head shaved to better show the head wounds. (5) Each of these photos also
shows a small ruler with an autopsy case number. None is particularly gruesome or graphic or shows
any autopsy mutilation. As was true for Exhibits 37-41, each photograph shows a different view. 
Exhibit 50 does not show the complainant at all; it shows four bullet fragments that were recovered
from the complainant's head, with a number one, two, three, or four beneath each fragment and a
ruler with the case identification number. Each photograph was used by a witness to illustrate
testimony.

 After reviewing the record, we cannot conclude that the trial court erred in overruling
appellant's objections that the photographs' probative value was substantially outweighed by their
potential for unfair prejudice or were cumulative of other evidence establishing the same facts. We
overrule points of error number six and seven.

III. JURY CHARGE ISSUES
 

 Points of error eight and nine allege error by the trial court in overruling appellant's objection
to the capital-murder application paragraph in the jury charge because it authorized a non-unanimous
verdict, contrary to Texas law and the United States Constitution. The jury charge, following the
allegations in the indictment, authorized conviction of capital murder if the jury found that appellant
had caused the complainant's death while in the course of committing, or attempting to commit,
robbery, kidnapping, or aggravated sexual assault. The jury charge also included an instruction that
"in order to return a verdict, each juror must agree thereto." The jury returned a general verdict
finding appellant "guilty of capital murder as charged in the indictment."

 Appellant asserts that two issues of constitutional magnitude are implicated here: 1) juror
unanimity is required by the United States Constitution in capital cases; and 2) a jury instruction
authorizing conviction of capital murder without requiring that every juror agree on the elements
which elevate the offense to capital murder violates that requirement. Appellant acknowledges that
the first issue appears to be an issue of first impression in this Court, and that, as a matter of state
law, Kitchens v. State, 823 S.W.2d 256 (Tex. Crim. App. 1991), cert. denied, 504 U.S. 958 (1992),
resolved the second issue contrary to his position. Nevertheless, he suggests that the continued
viability of Kitchens has become doubtful. Appellant argues that, in not requiring that the jury reach
a unanimous verdict regarding each, or at least one, of the three paragraphs alleging capital murder,
the jury charge permitted a non-unanimous verdict.

 "When an indictment alleges differing methods of committing capital murder in the
conjunctive, the jury may properly be charged in the disjunctive[,]" and "[t]he unanimity requirement
is not violated by instructing the jury on alternative theories of committing the same offense, in
contrast to instructing the jury on two separate offenses involving separate incidents." Martinez v.
State, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004). This reiterates what we said in Kitchens, 823
S.W.2d at 257-58.

 The relevant facts of Kitchens are very similar to the facts in the instant case. Kitchens was
charged by indictment with capital murder in three alternative paragraphs: causing death during the
course of either robbery, kidnapping, or aggravated sexual assault. Id. Kitchens' jury was instructed
that, if it found beyond a reasonable doubt that he had intentionally caused death during the course
of robbery or sexual assault, it would find him guilty of capital murder. Id. Kitchens claimed that
the jury charge failed to require a unanimous verdict because some jurors may have found him guilty
of murder in the course of robbery while other jurors may have found him guilty of murder in the
course of aggravated sexual assault. Id. We held that, when alternative theories of committing the
same criminal act are submitted to the jury in the disjunctive, it is appropriate for the jury to return
a general verdict if the evidence is sufficient to support a finding under any of the submitted theories.
Id. at 258. We also note the United States Supreme Court's determination that "there is no general
requirement that the jury reach agreement on the preliminary factual issues which underlie the
verdict." Schad v. Arizona, 501 U.S. 624, 632 (1991)(plurality opinion).

 Appellant asserts that the statutory aggravating factors alleged in the indictment which raise
the offense to capital murder are not merely the means according to which a single element is
proven, but rather are "the very elements of the alleged offense itself." Appellant cites Richardson
v. U.S., 527 U.S. 813 (1999), for the principle that a series of violations is not a single element under
the continuing-criminal-enterprise federal statute and that juror unanimity is required for each of the
series of violations. We find Richardson inapplicable here; appellant faced allegations of differing
manner and means of committing a single capital murder of a single complainant in a single incident. 
The alternative allegations were simply allegations of different manner and means of committing the
same capital murder. Appellant does not persuade us that our holding in Kitchens requires
reexamination.

 Regardless of whether juror unanimity is required by the United States Constitution in capital
cases, we conclude that the jury charge did not authorize a non-unanimous verdict, thus there was
no error in overruling appellant's objection to it on that basis. We overrule points of error numbers
eight and nine.

 Point of error ten asserts error in overruling appellant's objection to the trial court's
restrictive definition of the term "mitigating evidence" in its punishment jury charge because it
precluded the jury from considering certain evidence of his character and background in mitigation
of his punishment. The punishment jury charge included an instruction that, in answering special
issue two, the jury "shall consider mitigating evidence to be evidence that a juror might regard as
reducing [appellant's] moral blameworthiness." In asking whether there are sufficient mitigating 
circumstances to warrant the imposition of a sentence of life imprisonment rather than death, the
special issue itself included language of "taking into consideration all of the evidence, including the
circumstances of the offense, [appellant's] character and background, and the personal moral
culpability of [appellant]."

 Appellant objected to the definition of "mitigation" as submitted and requested that the trial
court instead submit a definition of mitigating circumstances as "circumstances which do not
constitute a justification or excuse of the offense in question, but which, in fairness and mercy, may
be considered in extenuating or reducing the moral culpability." The trial court overruled appellant's
objection and request and submitted the statutory mitigation definition. See Tex. Code Crim. Proc.
Art. 37.071, § 2(f)(4). Appellant argues that the statutory definition "effectively limits the relevance
of a capital defendant's character and background, which may be considered only as it relates to the
issue of moral culpability[.]" He asserts that the instruction given in his trial limited the jury's
consideration of his mitigation evidence because his strategy at punishment was "to convince the
jury that [he] should be spared a sentence of death, not because he was individually less culpable for
his crime, but rather because he had suffered a series of disadvantages which alienated and
embittered him in spite of an essentially happy character and polite demeanor." In particular,
appellant points to evidence that, during the important formative years of his life, his father, a
decorated military hero of Desert Storm, was absent. His mother was left alone to raise appellant
during his adolescence, a time when appellant was struggling with a learning disability and a seizure
disorder.

 The mitigation special issue "does not unconstitutionally narrow the jury's discretion to
factors concerning only moral blameworthiness" because the consideration and weighing of
mitigating evidence is an open-ended and subjective determination made by each individual juror. 
Cantu v. State, 939 S.W.2d 627, 648-49 (Tex. Crim. App.), cert. denied, 522 U.S. 994 (1997). We
note that Tex. Code Crim. Proc. Art. 37.071, § 2(e), requires the trial court to instruct the jury to
take into consideration "all of the evidence, including the circumstances of the offense, the
defendant's character and background, and the personal moral culpability of the defendant," in
answering the mitigation special issue. Id. at 648. Appellant's punishment jury charge included such
an instruction.

 We conclude that the evidence which appellant cites as providing his defense at punishment
was included in the instruction to consider "all of the evidence, including ... the defendant's
character and background" (emphasis added) in answering the mitigation special issue. We find no
error in overruling appellant's objection to the instructions regarding mitigating evidence that were
submitted to the jury. We overrule point of error number ten.

 Point of error eleven alleges error in overruling appellant's objection to the punishment-phase
jury charge for its failure to properly assign the burden of proof with respect to the mitigation special
issue. Appellant insists that Ring v. Arizona, 536 U.S. 584 (2002), and Apprendi v. New Jersey, 530
U.S. 466 (2001), require that the negative answer to the mitigation special issue, which is a
prerequisite to a sentence of death, be made under a standard of beyond a reasonable doubt. We
have previously held that Ring and Apprendi do not require the state to prove beyond a reasonable
doubt that there are no mitigating circumstances that would warrant forgoing of a death sentence.
Hankins v. State, 132 S.W.3d 380, 386 (Tex. Crim. App.), cert. denied, 125 S.Ct. 358 (2004). Thus
the trial court did not err in overruling appellant's objection. We overrule point of error number
eleven.

 Point of error twelve alleges error in overruling appellant's objection to the punishment-phase jury charge for its failure to include, by appellant's request, an instruction on the law of self-defense. The state had presented evidence that appellant had been violent with women (e.g. women
being choked, thrown to the ground, punched in the nose, etc.), and appellant had asserted through
cross-examination that he was defending himself in response to actions by those women, such as first
being pushed, slapped, grabbed, or attacked with a rake. Appellant argues that jurors should be
instructed about the law of self-defense in regard to extraneous offenses when jurors are deciding
whether the defendant did indeed commit the offense. He also argues that, without a clear
understanding of the conditions under which his allegedly assaultive behavior might have been
justified by the law of self- defense, the jurors could not fairly assign probative weight to evidence
of his conduct, which might, or might not, have been a violation of the law. Appellant asserts that,
since the future-dangerousness special issue asks the jury to decide whether there is a probability that
appellant will commit "criminal" acts of violence that would constitute a continuing threat to society,
the question is not about appellant's dangerousness in general but rather is whether there is a danger
that he will commit "crimes" in the future.

 In Nenno v. State, (6) the trial court admitted evidence that Nenno had patted a girl on her
buttocks. We held that such uncharged misconduct, whether criminal or not, is admissible at the
punishment phase of a capital-murder trial. Id. at 564. The jury could have found the incident to
be misconduct by the defendant, although relatively mild. An innocent explanation for conduct
affects the weight to be given evidence rather than its admissibility. Id. Thus, unadjudicated
extraneous-offense evidence may be admitted at the punishment phase of a capital-murder trial
without a showing that the behavior constitutes a crime.

 We have also held that, in capital cases, "the State need not prove beyond a reasonable doubt
that appellant committed the extraneous offenses admitted at punishment." Adanandus v. State, 866
S.W.2d 210, 234 (Tex. Crim. App. 1993). See also, Powell v. State, 898 S.W.2d 821, 830 (Tex.
Crim. App. 1994)("the State need not prove all of the elements of the extraneous offense. . . . Nor
need the State prove beyond a reasonable doubt that the defendant committed the extraneous
offense."). On cross-examination, appellant was able to elicit testimony about circumstances in the
extraneous offenses that could justify his actions. Further, even though appellant was not entitled to
it, the jury charge at the punishment phase of appellant's trial included an instruction that the jury
could not consider any testimony regarding appellant's commission of any offense other than the
offense for which he was charged in the indictment, i.e. extraneous offenses, unless it found and
believed beyond a reasonable doubt that appellant committed such other offense.

 Our previous decisions have approved the admission of extraneous-offense evidence at the
punishment phase of a capital-murder trial without requiring instructions on evidentiary burdens
regarding those extraneous offenses. The United States Supreme Court has said that sentencing
courts have traditionally heard evidence and found facts without any prescribed burden of proof at
all. McMillan v. Pennsylvania, 477 U.S. 79, 91 (1986). Appellant does not persuade us that there
is any requirement in our law that the punishment jury charge in a capital-murder trial must include
an instruction on the law of self-defense regarding extraneous offenses, even if raised by the
evidence. The trial court did not err in overruling appellant's objection to the absence of such an
instruction. We overrule point of error number twelve.

 We affirm the judgment of the trial court.

 Johnson, J.

En banc

Delivered: April 6, 2005

Do not publish
1. The indictment allegations of the three separate paragraphs were not listed in the conjunctive or
disjunctive, but rather the three paragraphs were listed consecutively as paragraphs A, B, C, without a conjunction.
2. Examples of those hypotheticals include the mercy killing of a long-time spouse who has lapsed into a
coma or is suffering during a terminal illness; killing a sleeping domestic abuser; and an elderly solid citizen or
decorated war veteran killing the neighborhood bully.
3. Appellant unsuccessfully objected to this exchange between Lucero and the state. 
4. "This is a venerable rule for reviewing credibility decisions, to which there is little alternative in a close
case. My question is, why permit close cases in selecting jurors?


"When a court faces an issue of fact, it must rely on limited sources of information. Only so many witnesses will have
relevant information about a contested issue of fact. When evidence conflicts, hard choices must be made. The trial judge
is the person whose decision must be respected. But there is ordinarily no such need when it comes to deciding whether
a citizen is qualified for jury service. If the question is close, the juror can be sent away.


"We said exactly that a few years ago. We applied our harmless-error standard to a line of cases in which we had held
that judgments of conviction would be reversed when a State's challenge for cause was erroneously granted. We said,
"By the standards of stare decisis, analysis of precedent, and logic, that holding ... is unsupportable. It is also contrary
to a policy which we think courts should follow: the liberal granting of challenges for cause. The venire comprises so
many jurors who are clearly qualified that it is unnecessary to err by denying a challenge for cause on a close question."
Jones v. State, 982 S.W.2d 386, 394 (Tex. Cr. App. 1998).


"Maybe the trial court could see in Venire Member Hawkins's demeanor and hear in her voice something that I cannot
read in her words, that she could excuse a murderer from the death penalty. But I do think that, when a potential juror
in a capital murder case is crying about the murder of her relative and thinks that no one who has killed another should
be allowed to live, we could ask our trial judges to let her go to a court that is trying a theft case and bring in another
person for the murder trial. If Ms. Murray were an eyewitness to the crime, she might well be irreplaceable. But as a
juror, she easily could have been replaced. I do not say that the trial judge's decision of this close question of fact was
wrong. But it was contrary to the policy that courts should follow." 


Threadgill v. State, 146 S.W.3d 654, 674 (Tex. Crim. App. 2004)(Womack, J., concurring).

5. Exhibit 48 shows a piece of paper that was stuck into the waistband of the complainant's jeans. Exhibit 49
shows that the paper is a small photograph of a fully dressed small child, with exhibit 48 showing the back side of
the photograph. The pathologist testified that he found the photo when he removed the complainant's clothing. The
photograph was admitted into evidence separately and was identified as a photo of the complainant's little brother. 
6. 970 S.W.2d 549, 564 (Tex. Crim. App. 1998), overruled in part on other grounds, State v. Terrazas, 4
S.W.3d 720 (Tex. Crim. App. 1999).